The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: **August 29, 2024**

**No. A-1-CA-40760**

**WESTERN ALBUQUERQUE**
**LAND HOLDINGS, LLC,**

Plaintiff-Appellee,

v.

**WESTLAND PARTNERS, LLC,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Denise Barela Shepherd, District Court Judge**

Peifer, Hanson, Mullins & Baker, P.A.
Charles R. Peifer
Mark T. Baker
Gregory P. Williams
Albuquerque, NM

for Appellee

Spencer Fane, LLP
Randy S. Bartell
Kaleb W. Brooks
Santa Fe, NM

for Appellant

**OPINION**

**WRAY, Judge.**

{1} The two cases before us[1] arise from the district court's exercise of equitable and legal jurisdiction to resolve a business dispute between Western Albuquerque Land Holdings, LLC (WALH)[2] and Westland Partners, LLC (Westland), which together engaged in a joint venture in the form of an entity that came to be known as Westside Economic Investments, LLC (the Company). WALH's predecessor in interest owned a parcel of real property (the Land), which it contributed to the Company for development, management, and sale. Eventually, the parties deadlocked about the continued feasible operation of the Company and each party brought claims to the district court. To resolve the impasse, the district court dismissed Westland's claim for breach of the covenant of good faith and fair dealing; granted WALH's motion for equitable dissolution of the Company; determined that Westland must pay certain outstanding property taxes associated with the Land; and

---

[1]This opinion addresses consolidated appeals, *Western Albuquerque Land Holdings, LLC v. Westland Partners, LLC*, A-l-CA-40609 (the dissolution appeal) and *Western Albuquerque Land Holdings, LLC v. Westland Partners, LLC*, A-l-CA-40760 (the tax and fee appeal), which stem from the same underlying facts and involve the same parties. *See* Rule 12-317(B) NMRA (recognizing an appellate court's ability to consolidate appeals on its own motion "[w]hen two (2) or more parties to the same case or different cases have filed separate timely notices of appeal").

[2]WALH is the successor to Westland Development Co., Inc. In this opinion we refer only to WALH.

awarded limited attorney fees to WALH. Westland appeals. We decline to disturb the district court's good faith analysis or legal and equitable determinations and affirm.

**BACKGROUND**

{2}    WALH and Westland formed the Company in 2004. The Company was to continue for thirty years with the main purpose of developing, marketing, and selling the Land through the Company. Under the Company's operating agreement (the Operating Agreement), Westland was the only member, acted as the Company's manager in charge of marketing and selling the Land, and had a 65 percent economic interest in the Company's profits, losses, and distributions. WALH contributed the Land to the Company and was designated as the "Economic Interest Owner" with a 35 percent economic interest. Section 6.04 of the Operating Agreement, which we designate as the Minimum Price provision, required the Land to be sold at a specific price per square foot, which increased at a set rate over time, unless WALH consented to a lower price. In addition, if a certain amount of the Land was not sold in a certain period of time, Section 14.01(a)(6) (the Minimum Sale provision) contemplated dissolution of the Company.

{3}    From 2006 to 2012, the Company sold some of the Land in compliance with the Minimum Price provision. But after 2012, the parties agree that the Minimum Price had increased well above market value. WALH refused to consent to sale of

the Land for a price below the Minimum Price, and the Company made no further sales.

{4}     In 2017, Westland twice refused WALH's demands to dissolve the Company, and WALH ultimately filed a complaint that included a request for equitable dissolution of the Company. Westland asserted a counterclaim and affirmative defense for breach of the implied covenant of good faith and fair dealing. The district court granted summary judgment in favor of WALH on both Westland's good faith and fair dealing counterclaim and WALH's motion for equitable dissolution. The district court ordered equitable dissolution of the Company according to the procedures outlined in the Operating Agreement and denied Westland's subsequent motion for relief from judgment. These orders are the subject of the first appeal to this Court (the dissolution appeal).

{5}     While the dissolution appeal was pending, the district court appointed a special master to oversee disputes that arose regarding dissolution of the Company. *See* Rule 1-053(A) NMRA (permitting appointment of a special master). The district court directed the special master to "review, consider, and promptly rule on disputes among the parties regarding compliance with the . . . Order and Decree of Dissolution," including the payment of unpaid property taxes. The district court's order also set forth a procedure for the adoption of and objections to the special master's report. And, based on the time-sensitive nature of the matter, the district

3

court ordered that "any party that unsuccessfully objects to a report from the [s]pecial [m]aster must pay reasonable costs and attorney fees the other party incurs related to the [s]pecial [m]aster's report to which it objected."

{6} Before the special master, the parties disputed, in relevant part, whether Westland was required to pay the property taxes owed on the Land. In the report, the special master recommended that the district court order Westland to pay "all unpaid property taxes for the [Company] land owed through the date of the deed to WALH." Westland objected to the special master's report and, following a hearing, the district court denied Westland's motion to modify or reject parts of the report. The district court found that Westland's objections "were not properly presented to the [s]pecial [m]aster" and "Westland did not present grounds to find the [s]pecial [m]aster[']s conclusions were erroneous." The district court also awarded attorney fees to WALH for the costs it incurred related to Westland's denied objections. Westland's second appeal (the tax and fee appeal) involves these tax and attorney fee orders.

**DISCUSSION**

{7} In the dissolution appeal, Westland argues that (1) genuine issues of material fact support its counterclaim and defense for breach of the covenant of good faith and fair dealing because WALH did not justify its refusal to consent to market-price sales of the Land; and (2) equitable dissolution using the procedure for dissolution set forth in the Operating Agreement was unwarranted based on WALH's actions

and the consequences to Westland. In the tax and fee appeal, Westland argues that the district court improperly (1) accepted without de novo review the special master's conclusion that Westland must pay outstanding property taxes on the Land; and (2) awarded attorney fees to WALH. We begin with the issues raised in the dissolution appeal.

## I. The Dissolution Appeal

{8} The dissolution appeal involves the district court's grant of summary judgment to WALH, which we review de novo, *see WV 23 Jumpstart, LLC v. Mynarcik*, 2024-NMCA-027, ¶ 5, 544 P.3d 301, as well as the district court's exercise of equitable authority, which under the present circumstances, we review for abuse of discretion. *See Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 2013-NMSC-017, ¶ 46, 301 P.3d 387.

## A. The District Court's Grant of Summary Judgment on Westland's Counterclaim and Defense Based on the Implied Covenant of Good Faith and Fair Dealing

{9} Westland rooted its defense and counterclaim for breach of the covenant of good faith and fair dealing in WALH's refusal to consent to sale of the Land at any price that did not conform to the Minimum Price. Westland first cites *Boss Barbara, Inc. v. Newbill*, 1982-NMSC-005, 97 N.M. 239, 638 P.2d 1084 and *Castle v. McKnight*, 1993-NMSC-076, 116 N.M. 595, 866 P.2d 323, to contend that Section 6.04 of the Operating Agreement created a "silent consent provision." Because the

Operating Agreement was silent regarding the circumstances under which WALH could refuse to consent to a price lower than the Minimum Price, Westland argues that the district court should have supplied "a term that is reasonable under the circumstances" as described in *Boss Barbara, Inc.* and *Castle*. Westland additionally maintains that WALH did not establish a prima facie case for summary judgment on the counterclaim as a matter of law and that breach of the covenant of good faith and fair dealing was a defense to WALH's subsequent claim for equitable dissolution. We first consider Westland's primary point—whether the covenant of good faith and fair dealing required the district court to impute a reasonableness requirement to WALH's withholding of consent under the Minimum Price provision.

**1.      The Covenant of Good Faith and Fair Dealing and Supplying a Term of Reasonableness to a Contractual Consent Provision**

{10}     The implied covenant of good faith and fair dealing "requires that neither party [to a contract] do anything that will injure the rights of the other to receive the benefit of their agreement." *Sanders v. FedEx Ground Package Sys., Inc.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449, 188 P.3d 1200 (internal quotation marks and citation omitted). To establish a breach of this covenant, a plaintiff must make a showing of "bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Valerio v. San Mateo Enters., Inc.*, 2017-NMCA-059, ¶ 28, 400 P.3d 275 (emphasis, internal quotation marks, and citation omitted). Based on good faith and fair dealing principles, "[w]hile a court will not imply a standard

6

of reasonableness in the face of the parties' expressed intent to the contrary, if a contract is silent regarding the manner of performance, a term which is reasonable in the circumstances is supplied by the court." *Castle*, 1993-NMSC-076, ¶ 9 (internal quotation marks and citation omitted). Where such a silent contract involves "reciprocal obligations," courts "look at the primary purpose of the contract and, absent language or conditions imposing a contrary result, will infer a standard of reasonableness in the performance of a consent clause." *Id.* ¶ 13. As we explain, no additional reasonableness standard need be implied to safeguard the covenant of good faith and fair dealing in the present case, because the Minimum Price provision is an express term that serves a primary purpose of the Operating Agreement.[3]

{11}     The Operating Agreement expressly sets out a contract price. Section 6.04 states the parties' intention as to price: the price was $2.00 per square foot, to "be increased by ten percent (10%) on an annual basis beginning one year after the date of [the] Agreement and on the same day of each year thereafter." Contrary to

---

[3]In the order granting summary judgment, the district court observed that Westland's good faith and fair dealing defense, which was based on the Minimum *Price* provision, did not apply to WALH's separate claim that was based on the Minimum *Sale* provision. Based on this, on appeal, Westland argues that the district court improperly determined "that the Minimum Sale [p]rovision . . . precludes the implied covenant from inuring to the Minimum Price [p]rovision." We need not separately consider any impact of the Minimum Sale provision on Westland's assertion of breach of the covenant of good faith and fair dealing, because we affirm the district court's determination that WALH did not breach the covenant of good faith and fair dealing at all.

Westland's concern that "WALH may arbitrarily withhold consent to sales at rates beneath the Minimum Price for any reason or no reason," a sufficient reason for WALH to withhold consent would be if a proposed price were below the Minimum Price as set forth in the Operating Agreement. The covenant "cannot be used to overcome or negate an express term contained within a contract," *Sanders*, 2008-NMSC-040, ¶ 8, because "[i]t would be incongruous to hold that [a party] acted in bad faith in acting in accordance with an express contractual provision." *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 67, 115 N.M. 690, 858 P.2d 66. Implying a reasonableness standard to WALH's refusal to consent to a price below the Minimum Price would be contrary to the parties' expressed intention. *See Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 23, 123 N.M. 526, 943 P.2d 560 ("A court cannot change contract language for the benefit of one party to the detriment of another."). Westland maintains, however, that because the Minimum Price provision does not provide parameters for WALH to refuse consent, the present case should require an imputed reasonableness term as was required in *Boss Barbara, Inc.* and *Castle*.

{12} Westland disregards significant differences between the contracts in *Boss Barbara, Inc.* and *Castle* and the Operating Agreement. In *Boss Barbara, Inc.*, our Supreme Court considered a commercial lease agreement that prohibited the lessee from subleasing the premises "without first obtaining the written consent" of the

8

lessor. 1982-NMSC-005, ¶ 2 (internal quotation marks and citation omitted). The primary purpose of the agreement was for the lessee to use the property and for the lessor to receive rent. If the lessor arbitrarily withheld consent to sublet, the lessee may not have been able to continue to use the property even though the lessor would still be entitled to receive rent and pursue unpaid rent. Thus, to avoid the lessor injuring the lessee's right to receive the fruits of the contract, *see Castle*, 1993-NMSC-076, ¶ 10, the lessor was required to "act reasonably when withholding . . . consent." *Boss Barbara Inc.*, 1982-NMSC-005, ¶ 10. In *Castle*, the contract required "the express written consent of the other party" to move the location of the boundary line fences of adjacent properties. 1993-NMSC-076, ¶ 2 (internal quotation marks omitted). The purpose of the agreement was "to confirm ownership of [the parties'] respective ranches based . . . upon the . . . true boundaries" of the properties. *Id.* When one party denied consent to move a fence, *id.* ¶¶ 1, 3, our Supreme Court determined that arbitrary refusal to consent would leave the agreement without "practical meaning." *Id.* ¶ 12. As a result, a reasonableness standard was imposed "so that the primary purpose of the agreement may be achieved." *Id.* Unlike the agreements in *Boss Barbara Inc.* and *Castle*, the consent provision in the Operating Agreement is tied to an express price term, which the parties agreed to and is therefore inherently reasonable. As a result, as we explain,

9

the primary purpose of the Operating Agreement would not be achieved if an additional reasonableness term were to be imposed.

{13} A primary purpose of the Operating Agreement was for the Company to sell the Land at a certain price and that WALH and Westland would receive proceeds of those sales—35 percent for WALH and 65 percent for Westland. If a reasonableness provision were imposed in addition to the express price term, WALH would have performed its "reciprocal obligation[]" by contributing the Land but would have to either receive less than the expected compensation from the sale of the Land or justify refusing to excuse Westland from performing its "reciprocal obligation[]" to sell the Land at the agreed upon price. *See Castle*, 1993-NMSC-076, ¶ 13. While Westland may have been able to sell more Land, WALH would have not received its expected price. Unlike with the commercial lease or the boundary line agreement in the cited cases, a primary purpose of the Operating Agreement would be undermined if WALH were required to demonstrate that it reasonably refused to consent to a price lower than the express price to which the parties agreed in the Minimum Price provision.[4]

---

[4]Westland contends that "the parties intended the Minimum [Price p]rovision to operate as nothing more than a backstop against below-market sales" and that affidavit evidence to that effect created a genuine issue of material fact that should have prevented summary judgment. *See* Rule 1-056(C) NMRA. The unambiguous meaning of a contract term, however, cannot be negated by extrinsic evidence of the parties' intent. *Cf. Sanders*, 2008-NMSC-040, ¶¶ 24-25 (concluding that the use of extrinsic evidence to explain an ambiguous and undefined term in a contract did not

10

{14} "The implied covenant of good faith and fair dealing protects the reasonable expectations of the parties to a contract arising from its terms." *Sanders*, 2008-NMSC-040, ¶ 1. The express terms of the Operating Agreement authorized WALH to refuse to consent to sales for a price below the Minimum Price. *See Beaudry v. Farmers Ins. Exch.*, 2018-NMSC-012, ¶ 25, 412 P.3d 1100 (stating that a party has the "privilege to engage in conduct that is authorized by the express terms of a contract"). Without a showing of bad faith or improper motivation, the covenant cannot be used to overcome or negate the Operating Agreement's Minimum Price provision. *See Sanders*, 2008-NMSC-040, ¶ 8. The district court therefore appropriately granted summary judgment on Westland's claim for breach of the implied covenant of good faith and fair dealing. *See Carrillo v. My Way Holdings, LLC*, 2017-NMCA-024, ¶ 24, 389 P.3d 1087 ("Summary judgment is proper where no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law.").

## 2. Westland's Remaining Arguments Regarding Good Faith and Fair Dealing

{15} We address together Westland's two remaining arguments relating to good faith and fair dealing. Westland contends that because WALH refused to consent to

---

contradict the principle "that express terms of a contract cannot be negated by extrinsic evidence"). Thus, Westland's evidence did not create a genuine issue of material fact to prevent summary judgment.

11

a price below the Minimum Price, (1) WALH could not establish a prima facie case for summary judgment on Westland's counterclaim for breach of the covenant of good faith and fair dealing; and (2) WALH's alleged breach of the covenant of good faith and fair dealing afforded Westland an affirmative defense to WALH's claim for equitable dissolution. Because we have already rejected the premise on which these arguments are based, Westland cannot prevail on these additional grounds for reversal.

{16}    For all these reasons, we affirm the district court's grant of summary judgment in favor of WALH on Westland's claim and affirmative defense for breach of the implied covenant of good faith and fair dealing.

**B.      Equitable Dissolution of the Company According to the Terms of the Operating Agreement**

{17}    We turn next to the district court's order equitably dissolving the Company and selecting as the method for equitable dissolution the procedure outlined in Article 14 of the Operating Agreement. Westland argues that (1) the district court applied the wrong equitable standard and the findings regarding the deadlock and impasse between the parties are legally insufficient to support equitable dissolution; and (2) the district court erred in its selection of the method to dissolve the Company. We examine each argument for abuse of discretion. *See Sunnyland Farms, Inc.*, 2013-NMSC-017, ¶ 46; *see also Cont'l Potash, Inc.*, 1993-NMSC-039, ¶ 26 (stating that an abuse of discretion "will be found when the [district] court's decision is

12

clearly untenable or contrary to logic and reason" (internal quotation marks and citation omitted)).

## 1.    The Order for Equitable Dissolution

{18}    To apply "[t]he maxim that [those] who seek[] equity must do equity" a district court must "necessarily . . . exercise its 'broad powers' to fashion an equitable remedy that ensures that justice has been done to the fullest extent possible with respect to each of the parties to the lawsuit." *Smith & Marrs, Inc. v. Osborn*, 2008-NMCA-043, ¶ 21, 143 N.M. 684, 180 P.3d 1183. In that sense, "equity functions as a supplement to the rest of the law where its remedies are inadequate to do complete justice." *State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 38, 487 P.3d 815 (internal quotation marks and citation omitted). Westland argues that the district court "applied an incorrect standard" to equitably dissolve the Company and challenges the sufficiency of the facts on which the district court relied. As we explain, the district court applied a standard that was substantially in line with the equitable principles discussed by Westland as well as New Mexico's longstanding equitable doctrines regarding the parties' actions, and in light of those principles and the circumstances, the district court appropriately exercised its equitable discretion.

{19}    To support its proposed standard for equitable dissolution, Westland turns to general principles of equity and the decisions of other jurisdictions to advocate for two "particularly relevant" factors: whether the claimant caused the deadlock

between the parties and whether "continuing profitable business is no longer reasonably practical or feasible." The district court's findings demonstrate that it based its conclusion on similar factors: (1) "the parties are at an impasse with regard to the operation of [the Company]"; (2) "they are deadlocked and will remain so"; (3) "they are unable to work with one another in the business of [the Company]"; (4) "because of the deadlock and impasse between the parties there is no business to operate within the framework of the Operating Agreement"; and (5) "the continued existence of [the Company] is not financially feasible." For both Westland and the district court, the parties' "deadlock and impasse" and inability to continue operation of the Company were primary considerations relating to dissolution. We do not hold that these are always or exclusively the appropriate considerations for equitable dissolution. But these considerations are closely tied to the present case and with no dispute to resolve as to the appropriate standard to apply, we turn to consider whether the equities relating to these factors supported dissolution. *Cf. City of Carlsbad v. Grace*, 1998-NMCA-144, ¶ 27, 126 N.M. 95, 966 P.2d 1178 (allowing consideration of "various equitable factors" for "recoupment" when "there is no well-established test setting forth the relevant equitable considerations").

{20}     Westland argues that the equities did not support dissolution because WALH caused the impasse by refusing to accept sales at prices below the Minimum Price and that the lack of findings about fault for the impasse demonstrate that the district

14

court did not properly weigh the equities. Westland points to "deposition testimony indicating that WALH's [unilateral] refusal to consider market-price sales under the Minimum Price [p]rovision went beyond the original intent of the parties who negotiated the [Company's] Operating Agreement" and was the "sole cause of the alleged impasse," notwithstanding Westland's "willingness to negotiate the distribution of proceeds to make WALH whole." Accepting Westland's premise that WALH caused the impasse, in granting WALH's motion for summary judgment on Westland's claim for breach of the implied covenant of good faith and fair dealing, the district court necessarily considered whether WALH acted in good faith. Though the district court made no specific findings, it determined that WALH acted in accordance with the terms of the Operating Agreement when it refused to consent to sales at a price below the Minimum Price. As a result, if WALH caused the impasse, the impasse was justified by the Operating Agreement and appropriately not weighed against WALH in the equitable balance.

{21}  Westland also argues that the equitable balance was skewed because the district court did not first resolve the parties' contractual disputes regarding the ability to continue operating the Company. Specifically, Westland contends that "the district court could not determine that it was not reasonably practicable to continue business under the Operating Agreement until it resolved the parties' disputes" regarding both the Minimum Price and Minimum Sale provisions. Contrary to

15

Westland's assertions, the district court resolved the Minimum Price provision dispute in WALH's favor by dismissing Westland's breach of good faith and fair dealing allegations. By the time of the impasse, the Minimum Sale provision dispute had no bearing on the ability to continue operating the Company. The Minimum Sale provision dispute related to whether the Company had sold sufficient acreage within the required time period. Even if Westland prevailed and established that the Minimum Sale provision was satisfied, WALH would not have been required to consent to a lower Minimum Price to sell the Land in the future, and the impasse would have continued. Accordingly, regardless of the outcome of that Minimum Sale provision dispute, WALH's claim for equitable dissolution would remain.

{22} The district court did not exceed logic by concluding that "there is no business to operate within the framework of the Operating Agreement and that the continued existence of [the Company] is not financially feasible." The district court, based on the thirty-year duration set forth in the articles of organization and the Operating Agreement, reasoned that "[l]eaving the parties deadlocked until 2034 is unjust," and "[d]issolution is a fair and just remedy under these circumstances." Having considered the evidence regarding the impasse and deadlock and balanced the equites in light of the parties' contractual rights, the district court did not abuse its discretion in ordering equitable dissolution.

16

## 2.     Dissolution According to the Terms of the Operating Agreement

{23}     Westland argues that the district court abused its equitable discretion by ordering the dissolution of the Company according to the procedure and process outlined in Article 14 of the Operating Agreement (the contractual dissolution procedure). As we have already set forth, "the issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion." *Jones v. Schoellkopf*, 2005-NMCA-124, ¶ 24, 138 N.M. 477, 122 P.3d 844 (internal quotations marks and citation omitted). To reverse in the present case, we must conclude that the district court's selection of the contractual dissolution procedure was "clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *See Smith & Marrs, Inc.*, 2008-NMCA-043, ¶ 22 (internal quotation marks and citation omitted). We discern no abuse of discretion because the district court had the "power to meet the problem presented, and to fashion a proper remedy to accomplish a just and proper result." *See Hilburn v. Brodhead*, 1968-NMSC-142, ¶ 11, 79 N.M. 460, 444 P.2d 971.

{24}     Confronted with the problem of how to dissolve the Company, the district court was timely presented with only one option. In response to WALH's request to use the contractual dissolution procedure, Westland suggested an evidentiary hearing "to ascertain the facts necessary to fashion a fair and balanced order of dissolution" but did not identify an alternative remedy. At the hearing addressing the

17

motion for dissolution, Westland again suggested an evidentiary hearing "so that the parties [could] develop a proposal" for "wind up" but again did not propose a specific procedure in opposition to the contractual dissolution procedure. In its motion for relief from judgment—*after* the district court ordered the contractual dissolution procedure—Westland suggested partition as an alternative and again requested an evidentiary hearing. WALH had clearly requested the contractual dissolution procedure in its motion for equitable dissolution, Westland did not timely offer an alternative procedure, and the district court's adherence to the contractual dissolution procedure cannot be viewed as "contrary to the logical conclusions demanded by the facts and circumstances of the case." *See Smith & Marrs, Inc.*, 2008-NMCA-043, ¶ 22 (internal quotation marks and citation omitted). Nevertheless, Westland argues that contractual dissolution was inequitable because none of the contractual reasons for imposing contractual dissolution occurred and the remedy resulted in a wrongful forfeiture. We are unpersuaded by these two arguments.

**{25}** As to the first argument, Westland contends that contractual dissolution is inequitable because the procedure commands "strict adherence to the negotiated [contractual] dissolution procedures in circumstances that the original parties to the . . . Operating Agreement did not contemplate," and ignores the contractual conditions for that procedure to be used. While an entry of a decree of *equitable*

18

judicial dissolution, such as the one in this case, is not one of the dissolution events that would trigger dissolution according to the procedure outlined in Article 14 of the Operating Agreement, Westland provides no authority that prevents a district court from using the terms of the contract between the parties to select the appropriate equitable relief and therefore establishes no abuse of discretion by the district court in selecting that procedure. *See Hilburn*, 1968-NMSC-142, ¶ 11 (affording a court of equity broad power to "fashion a proper remedy to accomplish a just and proper result").

{26} As to Westland's second argument, Westland maintains that the contractual dissolution remedy wrongfully "affects a significant forfeiture." This is not, however, a wrongful forfeiture case. A forfeiture is "essentially an equitable remedy." *Eker Bros., Inc. v. Rehders*, 2011-NMCA-092, ¶ 9, 150 N.M. 542, 263 P.3d 319 (internal quotation marks and citation omitted). Because forfeiture lies in equity, "the conditions prerequisite to the exercise of equity" must exist, including an "allegation or finding of fraud, hardship, oppression, mistake, or unconscionability." *Id.* ¶ 23; *see Cortez v. Cortez*, 2009-NMSC-008, ¶ 17, 145 N.M. 642, 203 P.3d 857 (declining to enforce a contractual forfeiture based on balancing the equities). Westland cites *Eker Bros., Inc.* and *Cortez* for support. The two cases, however, are distinguishable from the present case.

{27} In those cases, both courts considered whether one party's failure to perform a contract justified a penalty or whether under the circumstances, "the conditions prerequisite to the exercise of equity" effectively established a wrongful forfeiture. *Eker Bros., Inc.*, 2011-NMCA-092, ¶¶ 2-5, 21-23; *Cortez*, 2009-NMSC-008, ¶¶ 4-7, 15-17, 30. In *Eker Bros., Inc.*, the district court awarded damages against one party arising from a breach of the contract but did not offset the amount owed to that party for work that had been completed, which this Court found resulted in a wrongful forfeiture because "[n]one of the conditions prerequisite to the exercise of equity," which would justify a forfeiture, were present. 2011-NMCA-092, ¶¶ 4-5, 23. In *Cortez*, to avoid a wrongful forfeiture, our Supreme Court declined to enforce a late payment penalty against one party because the contractual language was not clear, "the defaulting party substantially performed with reasonable diligence and in good faith," and "the other party ha[d] suffered no damage by the delay." 2009-NMSC-008, ¶¶ 17, 26, 28 (internal quotation marks and citation omitted). The context of the present case is different. The district court did not impose a penalty on Westland based on any wrongful conduct or breach of the Operating Agreement by Westland. Instead, the district court ordered equitable dissolution as a remedy for the parties' impasse and deadlock, and selected the contractual dissolution procedure to govern the dissolution process. Westland neither admits to nor identifies any conduct on its part that the district court remedied by forfeiture. For that reason,

Westland did not establish that a forfeiture like those identified in *Eker Bros., Inc.* and *Cortez*, occurred at all.

{28} Instead, Westland contends that the contractual dissolution procedure caused a wrongful forfeiture because of the result—WALH "takes all of the remaining property . . . leaving Westland with nothing," and Westland loses "the benefit of the substantial improvements that it caused to be built" as well as "its substantial expectancy interest in future sales" and "its otherwise valuable interest in [the Company]." Westland's argument assumes that every forfeiture is wrongful. We, however, are unpersuaded that any forfeiture was unfair based on the undisputed facts of this case and the district court's findings. *See Eker Bros., Inc.*, 2011-NMCA-092, ¶¶ 21-23 (requiring that a forfeiture be supported by "the conditions prerequisite to the exercise of equity"). It is undisputed that Westland, in performance of its contractual obligations, developed and improved the Land. For that performance, Westland received an economic benefit under the Operating Agreement, including cash distributions from the sale of the Land, which amounted to approximately $5.2 million dollars. Westland offered no evidence to establish an economic loss resulting from any forfeiture of potential future sales, and the Operating Agreement did not give Westland any expectancy that sales were guaranteed. Indeed, the Operating Agreement contemplated dissolution and reversion of the Land to WALH under some circumstances. The parties did not

21

dispute that future sales at the Minimum Price were unlikely—that fact was the source of the parties' impasse. The district court determined that forcing WALH to wait out the term of the contract was more detrimental than depriving Westland of a seemingly futile opportunity to continue to try to sell the Land. Based on these facts and findings, Westland was compensated under the Operating Agreement for its expenditures and any forfeiture was supported by the equities.

{29}   We conclude that the district court did not abuse its discretion in ordering the parties to employ the contractual dissolution procedure outlined in the Operating Agreement. The district court's exercise of its equitable discretion in this case was not clearly untenable or contrary to logic and reason. *See State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 28, 329 P.3d 658 ("The application of equitable doctrines and the granting of equitable relief rests in the sound discretion of the district court." (internal quotation marks and citation omitted)).

## II.   The Tax and Fee Appeal

{30}   In this appeal, we consider the challenges to the district court's rejection of Westland's objections to the special master's determination that Westland must pay the outstanding property tax liability and the district court's related award of attorney fees to WALH. As we explain, the circumstances supported the special master's conclusion that Westland had the obligation to pay the property taxes and the district

22

court appropriately reviewed the special master's report. Otherwise, we conclude that Westland did not preserve the attorney fee challenge.

**A.      The Special Master's Property Tax Determination**

{31}      We review the district court's adoption of a special master's report with the same standard applied by the district court: we accept the special master's findings of fact unless they are "clearly erroneous," Rule 1-053(E)(2), and review conclusions of law de novo, *State ex rel. Off. of State Eng'r v. United States*, 2013-NMCA-023, ¶ 17, 296 P.3d 1217. Westland does not dispute the special master's factual findings, and limits its challenges to Conclusion of Law No. 5, which states in relevant part, that "Westland's obligation to pay property taxes for [the Company] land has been established by Westland's course of conduct, by Westland's admissions, and by the terms of the Operating Agreement, and is equitable after balancing the rights of both parties." Westland argues that (1) Conclusion of Law No. 5 is substantively erroneous; and (2) the district court failed to perform a de novo review of Westland's objection to Conclusion of Law No. 5.

**1.      Westland's Substantive Challenge to the Special Master's Conclusion of Law No. 5**

{32}      Westland argues on appeal that each of the bases for ordering Westland to pay the property taxes is erroneous. We conclude that the Operating Agreement and the parties' course of performance, together with the equities involved, support the special master's conclusion that Westland had the obligation to pay the property

23

taxes. We consider the Operating Agreement and course of performance before addressing the special master's balancing of the equities.

{33} The special master appears to have relied on Section 8.02 of the Operating Agreement, which provides in relevant part that Westland "shall" contribute to the Company only "those funds necessary to develop and market the property owned by the Company that cannot be obtained through financing by the Company in the amounts and at the times determined by the Members." On appeal, Westland challenges the special master's reliance on Section 8.02 and further argues that payment of property taxes is foreclosed by Article 14 of the Operating Agreement. Westland's arguments require us to interpret the Operating Agreement.

{34} In contract interpretation, "we give force and effect to the intent of the parties." *Bachmann v. Regents of Univ. of N.M.*, 2021-NMCA-050, ¶ 24, 496 P.3d 604 (internal quotation marks and citation omitted). We derive the parties' intent "from the language employed by them; and where such language is not ambiguous, it is conclusive." *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844 (internal quotation marks and citation omitted). To determine whether a contract term is ambiguous, "a court may hear evidence of the circumstances surrounding the making of the contract" as well as the parties' course of performance. *Id.* (internal quotation marks and citation omitted). Westland argues that under Section 8.02,

"[t]ax payments are not 'funds necessary to develop and market the property'" and that in the relevant time period, Westland was not developing or marketing the Land.

{35} Section 8.02 does not expressly state what funds are "necessary" to "develop and market" the Land, and the parties provide competing interpretations of the Operating Agreement. Westland argues that based on common definitions, these terms mean "to make the property usable for commercial development or available for sale on the real estate market" and that the payment of property taxes is not necessary to fulfill either obligation because unpaid property taxes can be resolved at the time any of the Land is sold with funds from the sale. In that scenario, no additional capital contributions from Westland would be necessary under Section 8.02 because Section 9.02(a) of the Operating Agreement provides that property taxes were to be paid before distribution of gross proceeds. WALH counters that unpaid property taxes can result in seizure and sale of property within three years of delinquency, which necessarily impacts the ability to further develop and market the Land. WALH's scenario would come into play if no sales occur or sales are insufficient to provide funds to pay property taxes. In that circumstance, additional capital contributions would be "necessary" to be able to avoid seizure and continue to develop and market the Land. The parties could have intended both constructions, depending on whether the Company successfully sold the Land. For this reason, the parties' course of performance becomes relevant to evaluate the parties' intent under

25

the present circumstances—with no sales of the Land. *See Conoco Phillips Co.,* 2013-NMSC-009, ¶ 29 (concluding that "because New Mexico law clearly permits courts to consider course of dealing and course of performance evidence when determining whether a contractual term is ambiguous, the district court's reliance on course of dealing and course of performance evidence was proper" (citation omitted)); *see also* UJI 13-828 NMRA (defining "course of performance" as "the way the parties have conducted themselves in the performance of the contract which it is reasonable to regard as establishing the parties' common understanding of the meaning of the term[s] in dispute").

{36} The special master found—and Westland does not dispute—that Westland historically paid the property taxes in years during which there were no sales of the Land.[5] The special master also found that Section 8.02 required payment of property taxes because Westland was marketing the Land as late as May 2022 based on a purchase and sale agreement between the Company and Westland "and proposed potential future sales." Westland contends that the special master mischaracterized its recent activities in marketing the Land, because no funds were necessary to essentially sell the Land to itself. It is Westland's undisputed performance, however,

---

[5]We note that at oral argument, Westland explained that during the joint venture, when three years passed without a sale, Westland made a capital contribution to the Company for the Company to pay the property taxes and avoid a tax sale.

that supports WALH's interpretation of Section 8.02 and Conclusion of Law No. 5—that the parties intended that the payment of property taxes was "necessary" to develop and market the Land in years with no sales.[6] This evaluation does not rely on Westland actively developing and marketing the Land, because the course of the parties' performance demonstrates the parties' intent that property taxes would be "necessary to develop and market" the Land—whether actively or not.

{37}     Westland maintains that the special master's conclusion is contrary to three other express provisions of the Operating Agreement. First, Westland argues that Section 8.02 is discretionary, because contributions were only required if the Company could not obtain other sources of financing and because the contributions were to be "in the amount and at the times determined by the Members." Westland does not explain how these remaining conditions undermine Westland's obligation to make "necessary" contributions, and we do not consider this argument further. Second, Westland points to Section 6.02, which limits a member's liability for the Company's debts and losses. But that provision is subject to the obligations incurred under Section 8.02, which we have already concluded could be read to require Westland to pay the taxes when the Land was not sold or sales were insufficient to

---

[6]Westland challenges on several fronts the special master's reliance on a purported "judicial admission" made by Westland's counsel at a May 2022 hearing. We decline to parse these arguments and instead view the statement not as a binding judicial admission but as further and cumulative evidence of the parties' understanding that Westland would pay the property taxes.

cover the property taxes. Third, Westland contends that Section 14.03(e) is an express limitation on capital contributions once the Company has dissolved. Section 14.03(e) provides that "[n]otwithstanding anything to the contrary in this Operating Agreement, upon a liquidation, if any Member or Economic Interest Owner has a Deficit Capital Account . . . the Member or Economic Interest Owner shall have no obligation to make any Capital Contribution." Westland contends that Section 14.03(e) relieves Westland of any obligation under Section 8.02 to make additional capital account contributions during the dissolution process and therefore contradicts the special master's application of Section 8.02. As we explain, even though Section 14.03 appears to limit the application of Section 8.02 after dissolution, we affirm the decision of the special master and the district court.

{38}    The order of referral did not limit the special master's determination about the payment of property taxes to the provisions of the Operating Agreement. The district court's decree of dissolution ordered that the Company be "promptly be dissolved pursuant to the terms of Sections 14.01 through 14.06" but also reserved jurisdiction to supervise and enforce the terms of the dissolution. The order of referral directed the special master to "review, consider, and promptly rule on disputes among the parties regarding compliance with" the district court's dissolution order and "such other matters as referred by the [c]ourt." Specifically, the special master was ordered to

conduct the required proceedings with all reasonable diligence consistent with the . . . Order and Decree that:

1.     [The Company] "shall promptly be dissolved pursuant to the terms of Section[s] 14.01 through 14.06 of the Operating Agreement"; and

2.     The [district c]ourt's reservation "of jurisdiction over this matter to supervise and enforce the terms of the Order and Decree and to enter such supplemental relief as may be appropriate to facilitate an orderly dissolution."

The [s]pecial [m]aster also shall address in the first instance the payment of unpaid property taxes for [the Company].

The district court's order of referral therefore contemplated dissolution—pursuant to Article 14—as well as continued supervision of dissolution, supplemental relief, and analysis of the property tax issue "in the first instance"—without reference to Article 14.

{39}     Thus, in accordance with the order of referral, even though the parties may have intended for Article 14 to shield them from capital contributions under Section 8.02 after a liquidation, the special master's determination was based on more than the Operating Agreement. The special master concluded that Westland "failed to comply with the [d]issolution [o]rder" and required Westland to complete dissolution, return the Land "unencumbered" to WALH, provide documents, and pay the outstanding property taxes. The special master explained that Westland was obligated to pay the property taxes based on the Operating Agreement and the course of performance, which we have already discussed, as well as the equitable balance

of the parties' rights. The determination that Westland should pay the taxes was based on a combination of reasons, including Westland's unilateral decision not to comply with Section 8.02 before dissolution was ordered, despite previously making capital contributions to pay property taxes, and its failure to promptly dissolve the Company after dissolution was ordered. In this way, the special master considered the provisions of the Operating Agreement and the parties' actions to determine the payment of the property taxes "in the first instance," as ordered by the district court. Westland contends that the order to pay the property taxes is inequitable because Westland lost its interest in the Land and WALH engaged in bad conduct. We have already determined that WALH did not act in bad faith and that if any forfeiture occurred, it was not wrongful. Westland does not challenge the special master's finding that Westland "unilaterally stopped paying the taxes during the course of litigation" and the conclusion that it did not promptly dissolve the Company as ordered by the district court. We are therefore satisfied that the district court did not abuse its discretion in adopting the special master's view of the equities.

**2.      Westland's Standard of Review Challenge**

{40}      Westland also contends that the district court did not perform an adequate de novo review of Conclusion of Law No. 5. A special master's conclusions of law are to be reviewed de novo by district courts. *See Lee v. Martinez*, 2004-NMSC-027, ¶ 12, 136 N.M. 166, 96 P.3d 291; *see also* Rule 1-053(E)(2) ("The court after hearing

30

may adopt the [master's] report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."). In reviewing a special master's conclusion of law, a district court must "exercise [its] own independent judgment without assigning special weight to [the special master's] decision." *Lee*, 2004-NMSC-027, ¶ 12 (alteration, internal quotation marks, and citation omitted). To evaluate whether the district court conducted an adequate independent review, this Court considers whether the district court adopted the report without a hearing, without a stated analysis, and without discussion of the special master's legal conclusion. *See Lozano v. GTE Lenkurt, Inc.*, 1996-NMCA-074, ¶ 19, 122 N.M. 103, 920 P.2d 1057 (stating the factors considered for our review).

{41}    Westland claims that there is "little evidence of record that the district court fulfilled its duty to perform a de novo review with respect to" Conclusion of Law No. 5, because (1) the district court "believed that Westland's objections were not appropriately preserved" and rather "presumed that the special master's conclusions of law were accurate unless Westland demonstrated some error"; and (2) the written order did "not contain any detailed discussion of the special master's findings of fact and conclusions of law" or reflect that the district court exercised independent judgment. We disagree, because the district court outlined the procedure for objections in the order of referral to the special master, held a hearing on the

objections, indicated it reviewed the pleadings that included briefs and exhibits, and heard the parties' arguments. Accordingly, we determine that the district court adequately reviewed and appropriately adopted the special master's Conclusion of Law No. 5 regarding the payment of property taxes for the Land.

**B.     The Attorney Fee Appeal**

{42}     Westland last appeals the district court's award of attorney fees to WALH for the fees that WALH incurred in response to Westland's objections to the special master's report. Westland argues that "[t]his case does not fall within any of the recognized exceptions to the American rule," which holds litigants responsible for their own attorney fees. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶¶ 9, 15, 127 N.M. 654, 986 P.2d 450 (identifying three categories of exceptions to the American rule). WALH responds that Westland did not preserve this argument for appeal and alternatively, that "it was well within the district court's discretion to incorporate a fee-award provision into its order referring post-dissolution matters to the special master." As we explain, because we conclude that this issue was not preserved, we do not reach the merits of this argument.

{43}     To show that an issue is preserved for appeal, a party must establish that "a ruling or decision by the trial court was fairly invoked." Rule 12-321(A) NMRA. "The preservation rule has extraordinary importance and is not simply a technical bar to review employed by this Court to eliminate issues." *Stanley v. N.M. Game*

*Comm'n*, 2024-NMCA-006, ¶ 39, 539 P.3d 1224 (internal quotation marks and citation omitted), *cert. denied* (S-1-SC-40099, Dec. 8, 2023).

> The primary purposes for the preservation rule are: (1) to specifically alert the district court to a claim of error so that any mistake can be corrected at that time, (2) to allow the opposing party a fair opportunity to respond to the claim of error and to show why the district court should rule against that claim, and (3) to create a record sufficient to allow this Court to make an informed decision regarding the contested issue.

*Lasen, Inc. v. Tadjikov*, 2020-NMCA-006, ¶ 15, 456 P.3d 1090 (alteration, internal quotation marks, and citation omitted). The record supports WALH's position that Westland did not preserve this issue. Westland did not object to the fee provision in the order appointing the special master, in the motion to modify or reject parts of the special master's report, after WALH requested fees in response to those objections, at the hearing on Westland's motion where the district court stated that it would award WALH attorney fees and costs, or after WALH submitted its fee petition. Westland points only to the proposed form of the order of referral that it submitted to the district court, which did not include the language that fees would be imposed if objections were lodged. The alternative form of order was sufficient, Westland argues, because all of the procedures for submitting competing forms of order were followed, the district court adopted WALH's proposed order without a hearing, and Westland's only opportunity to object to the attorney fees under the local rules was to submit a competing form of order. *See* Rule LR2-125(D) NMRA (explaining that

if the parties cannot agree on a form of order within fourteen days, the prevailing party "shall" request a hearing, the parties "shall submit proposed forms of order," and regardless, the district court may rule without a hearing). Westland does not explain how presenting the proposed form of order of referral, which simply did not include the fee provision, invoked a ruling from the district court about the basis for the court's authority to award fees, which is the grounds on which Westland challenges the fee award on appeal. *See Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

{44}    Westland instead argues preservation was not required, *see* Rule 12-321(A), because it had "no opportunity to respond to the request for fees in writing" and the district court's order of referral did not allow for Westland to file a reply brief after WALH requested fees in response to Westland's objections. Westland, however, does not address its silence on the issue at any other time before this appeal and does not explain why it did not object to the district court's ruling on attorney fees at the hearing after WALH made its request. Thus, it was the district court that had no opportunity to correct any mistake in awarding fees. *See Lasen, Inc.*, 2020-NMCA-006, ¶ 15. Because Westland has not asked this Court to apply any of the other exceptions to the preservation rule, *see* Rule 12-321(B) (identifying exceptions to

the preservation rule: the general public interest, plain or fundamental error, or a party's fundamental rights), we decline to reach the merits of the argument regarding attorney fees.

**CONCLUSION**

{45}    For the reasons stated herein, we affirm.

{46}    **IT IS SO ORDERED.**


_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**


_____
**J. MILES HANISEE, Judge**


_____
**KRISTINA BOGARDUS, Judge**